Joseph **BERNITSKY**; Albert Bernitsky; Vincent Bernitsky and George Stenulis, Individually and trading as Bernitsky Brothers Coal Company, Slope No. 2,

v.

**UNITED STATES** of America, United States Department of Justice, Washington, D. C.

No. 79–1453.

United States Court of Appeals, Third Circuit.

Argued Nov. 16, 1979.

Decided March 19, 1980.

Thomas B. Rutter (argued), Philadelphia, Pa., for appellants.

Robert S. Forster, Jr., Asst. U. S. Atty., Philadelphia, Pa., Raymond A. Nowak (argued), Charles E. Mandolia, Attys., Torts Branch Civil Div., Dept. of Justice, Washington, D. C., for appellee.

Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The issue on appeal in this case is the scope of the discretionary function exception of the Federal Tort Claims Act.

On July 11, 1973 a Federal Mine Safety Inspector, acting pursuant to the Federal Coal Mine Health & Safety Act of 1969, 30 U.S.C. § 801 *et seq.* (hereinafter FCMHSA), inspected the mine owned and operated by appellant, Bernitsky Brothers Coal Company (hereinafter Bernitsky), located at New Philadelphia, Schuylkill County. Among the items inspected was whether the toilet facility complied with the updated list of "Approved Underground and Surface Sanitary Facilities" promulgated by The Bureau of Mines which had been revised April 1973 and distributed to the local mine inspectors on June 28, 1973. The inspector found that the toilet facility at the mine was not on the approved list and he served a Notice of Violation on Bernitsky immediately following his inspection. Approved toilet facilities were available in the vicinity of the mine at a cost of $79.00 but Bernitsky did not purchase a complying toilet nor did it utilize the available administrative and judicial remedies in an attempt to have the Notice of Violation vacated. Over the next seven months, at Bernitsky's request the date for compliance with the Notice was extended three times by mine inspectors. Finally, on February 13, 1974 the Mining Enforcement and Safety Administration (hereinafter MESA), issued a Withdrawal Order pursuant to Section 104(b), of the statute, 30 U.S.C. § 814(b) (1976), barring any access to the mine other than that required to abate the violations. In April 1974 portions of the mine collapsed. Bernitsky claims that as a result of the collapse various mining tools and equipment were damaged and it could not extract certain amounts of coal, causing damage totaling $2,591,000 which it seeks to recover from the federal government through this action. One cannot resist commenting that for want of a nail, the kingdom was lost.

Bernitsky filed suit on March 19, 1976 pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1976). The complaint alleges that the Notice of Violation and subsequent Order of Withdrawal barring access to the mine were issued neg-

ligently and caused the mine's collapse by preventing Bernitsky's employees from performing the mining and maintenance operations which were necessary to prevent the collapse. Following more than two years of discovery, the United States filed a Motion to Dismiss or in the Alternative for Summary Judgment on December 8, 1978 supported by affidavits and deposition testimony. On January 11, 1979, the district court ruled that the FCMHSA did not give rise to a private right of action by a mine operator and that there was no liability under the Federal Tort Claims Act because Pennsylvania would not impose liability under the circumstances of this case. *Bernitsky v. United States,* 463 F.Supp. 1121 (E.D.Pa. 1979). Accordingly, the action was dismissed.

On appeal, the appellant concedes that it has no private right of action accruing under the FCMHSA. It relies solely on its claim under the Federal Tort Claims Act.

The operative provision of that statute subjects the United States to liability:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (1976). Because liability of the United States is contingent on liability under the "law of the place where the act or omission occurred", in this case Pennsylvania, Bernitsky focuses a considerable portion of its argument on an attempt to establish that under the law of the Commonwealth of Pennsylvania, the circumstances set forth above would give rise to a cause of action for negligence. We need not consider the validity of this argument because we dispose of this case on other grounds.

■ In its Answer, the United States pleaded the affirmative defense that the court lacked subject matter jurisdiction be-

cause the acts complained of are specifically excluded from the Federal Tort Claims Act by the provision exempting acts within the discretionary function of United States employees. This was also one of the bases urged by the United States in its Motion to Dismiss or in the Alternative for Summary Judgment. Although the exception was not the basis for the district court's dismissal of the action, we deem it appropriate to consider its applicability as an initial matter since it involves the central issue of the scope of the United States' surrender of its immunity to suit by passage of the Federal Tort Claims Act. We can do so because it is well established that we are free to affirm the judgment of the district court on any basis which finds support in the record. *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 140 (3d Cir. 1978); *Fairview Park Excavating Co. v. Al Monzo Construction Co.,* 560 F.2d 1122, 1123 n. 1 (3d Cir. 1977); *United States v. Pennsylvania,* 533 F.2d 107, 110 n. 7 (3d Cir. 1976). Because we consider affidavits and accompanying material presented in connection with the Government's Alternative Motion for Summary Judgment which have not been controverted by opposing affidavits, and which demonstrate there is no genuine issue as to any material fact, Fed.R.Civ.P. 56, we can review the district court's dismissal under the standard of the propriety of a grant of summary judgment. *See First State Bank of Hudson County v. United States,* 599 F.2d 558, 562 (3d Cir. 1979).

■ The boundaries of the sovereign immunity waived by the Federal Tort Claims Act are delineated by the statutory provision excepting certain claims. 28 U.S.C. § 2680 (1976). The discretionary function exception provides:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or

performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* § 2680(a).

This encompasses two discrete claims: the first excepting acts or omissions of governmental employees in carrying out statutes or regulations and the second excepting acts of discretion in the performance of governmental functions or duty. It is generally the latter phrase which is considered the discretionary function exemption.

There has been a considerable amount of difficulty, recognized by both the courts and the commentators, in applying the discretionary function exception.[1] In the Supreme Court's initial interpretation of the provision, the Court stressed that the exception was designed to apply to those governmental functions which entail a policy judgment and decision. *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). "It is the discretion of the executive or the administrator to act according to one's judgment of the best course" which Congress has protected. *Id.* at 34, 73 S.Ct. at 967. Many of the later cases have focused on the policy judgment aspect of the circumstances in determining whether the exception is applicable. *See, e. g., Huntington Towers, Ltd. v. Franklin National Bank*, 559 F.2d 863, 870 (2d Cir. 1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978); *First National Bank in Albuquerque v. United States*, 552 F.2d 370, 374–75 (10th Cir.), *cert. denied*, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977); *Griffin v. United States*, 500 F.2d 1059, 1066–67 (3d Cir. 1974). Others have made the distinction between conduct at the planning level, which is considered exempt, and conduct at the operational level, which is not. *See, e. g., Driscoll v. United States*, 525 F.2d 136, 138 (9th Cir. 1975); *Spillway Marina, Inc. v. United States*, 445 F.2d 876, 878 (10th Cir. 1971); *United Air Lines v. Wiener*, 335 F.2d 379, 392–93 (9th Cir.), *cert. dismissed*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); *Swanson v. United States*, 229 F.Supp. 217, 220 (N.D. Cal.1964); *Wildwood Mink Ranch v. United States*, 218 F.Supp. 67, 76–77 (D.Minn.1963). Yet another distinction which has been made, although now of questionable authority, is that between the sovereign functions of government, which were stated to be within the exemption, and the proprietary functions, which were not. *See, e. g., National Mfg. Co. v. United States*, 210 F.2d 263, 277 (8th Cir.), *cert. denied*, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108 (1954), *but see Indian Towing Co. v. United States*, 350 U.S. 61, 64–65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955).

Although these distinctions may provide some guidance in explaining the result of the cases, they do not offer much assistance in the determination whether the activity in question in a particular case falls on the side of liability or immunity. Rather than engage in a semantic attempt to decide in which category this case falls, we believe it will be more productive to develop the factual similarities among the vast array of judicial precedent on this issue.

The affidavits and deposition testimony incorporated therein filed by the Government in support of its Motion, to which Bernitsky filed no opposing affidavits, have narrowed Bernitsky's claim to the allegation that the inspector negligently issued the Withdrawal Order,[2] with the conse-

---

1. See *Dupree v. United States*, 247 F.2d 819, 825 (3d Cir. 1957); Jayson, *Application of the Discretionary Function Exception, Symposium on the Federal Tort Claims Act*, 24 Fed.B.J. 153 (1964); Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act*, 57 Geo.L.J. 81, 82 (1968).

2. In support of its Motion to Dismiss or in the Alternative for Summary Judgment, the Government presented affidavits and deposition testimony from several coal mine inspectors that they had repeatedly inspected the mine and determined that the underground sanitary facility provided by Bernitsky was not on the approved list. Despite the allegations in Bernitsky's complaint that Government agents negligently failed to determine that the facility was approved and that they failed to advise Bernitsky and others that the facility was ap-

quence being the collapse of the mine. Since the inspector concededly had the statutory authority to issue the Withdrawal Order and accepting, as we must for this purpose, the causation alleged, the issue thus clearly emerges: Does the issuance of that Order, however arbitrary or negligent, constitute the exercise of a discretionary function?

A review of the case precedent suggests a number of factual analogs. One line of cases holds that the issuance or refusal to issue a Government license or permit falls within the discretionary function exemption. *See Lawrence v. United States*, 381 F.2d 989, 990–91 (9th Cir. 1967) (failure to issue permits to occupy portion of trust patent Indian land); *United States v. Morrell*, 331 F.2d 498, 502 (10th Cir.), *cert. denied*, 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964) (issuance of grazing permits even when officials allegedly knew the stock would stray upon and damage lands of plaintiffs); *Chournos v. United States*, 193 F.2d 321, 323–24 (10th Cir. 1951), *cert. denied*, 343 U.S. 977, 72 S.Ct. 1074, 96 L.Ed. 1369 (1952) (denial of permit to graze on public lands); *United States v. Waylyn Corp.*, 130 F.Supp. 783, 787 (D.P.R.1955), *aff'd on other grounds*, 231 F.2d 544 (1st Cir.), *cert. denied*, 352 U.S. 827, 77 S.Ct. 40, 1 L.Ed.2d 49 (1956) (withholding occupancy permits); *Smith v. United States*, 101 F.Supp. 87, 88–89 (D.Colo.1951), *appeal dismissed*, 196 F.2d 222 (10th Cir. 1952) (reduction of plaintiff's grazing privileges).

Another line of authority with some similarity to this case is that holding the decision to prosecute or not to prosecute falls within the discretionary function. *Smith v. United States*, 375 F.2d 243, 247 (5th Cir.), *cert. denied*, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); *Brooks v. United States*, 152 F.Supp. 535, 537 (S.D.N.Y.1957). The same is true of a decision when to institute and prosecute condemnation proceedings. *Goddard v. District of Columbia Redevelopment Land Agency*, 109 U.S.App.

D.C. 304, 306, 287 F.2d 343, 345 (D.C. Cir.), *cert. denied*, 366 U.S. 910, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961). The decision to abruptly close garbage dumps at Yellowstone National Park in connection with the management of grizzly bears within the park was held to entail the type of judgment exempted by the discretionary function provision, notwithstanding the claim that the decision resulted in the death of a camper. *Martin v. United States*, 546 F.2d 1355, 1360 (9th Cir. 1976), *cert. denied*, 432 U.S. 906, 97 S.Ct. 2950, 53 L.Ed.2d 1078 (1977). Issuance of a cease and desist order by the F.D.I.C. if it believes the bank is engaging in unsound practices is a determination left to the discretion of the agency. *Davis v. Federal Deposit Insurance Corporation*, 369 F.Supp. 277, 280 (D.Colo.1974). In a case with facts somewhat parallel to the one under consideration, the court held a coal mine owner could not bring a Federal Tort Claims Act case claiming damages as a result of an administrative decision not to operate a coal mine seized by the Government under executive authority in furtherance of the war effort. *Old King Coal Co. v. United States*, 88 F.Supp. 124, 125 (S.D. Iowa 1949).

Bernitsky seeks to distinguish the discretionary function situation by bringing itself within the line of authority which appears to authorize a Federal Tort Claims Act claim for negligent inspection by government agents who fail to uncover dangerous conditions ultimately causing harm to third persons. *Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa.1978); *Toppi v. United States*, 327 F.Supp. 1277 (E.D.Pa.1971). It also relies on cases under Pennsylvania law permitting a similar cause of action against private parties for negligent inspection. *Knight v. Otis Elevator Co.*, 596 F.2d 84 (3d Cir. 1979); *Evans v. Otis Elevator Co.*, 403 Pa. 13, 168 A.2d 573 (1961).

■ Those cases are inapplicable in this situation. Even though Bernitsky has sought to cast its claim in terms of negli-

---

proved, Bernitsky failed to present any factual evidence in its Answer to the Government Motion controverting the Government evidence

that the facility was unapproved at the time the Notice of Violation was issued.

gence, a review of the material filed in connection with the Motion to Dismiss, or in the Alternative for Summary Judgment, establishes that plaintiff claims neither that there was any negligent inspection nor that there was negligence premised upon the failure to inspect.[3] On the contrary, the inspection accurately disclosed that there was a nonconforming facility. Once that was evident, the inspector issued the notice of violation, within his statutory authority, 30 U.S.C. § 814(b) (1976), and, when the violation remained uncorrected after seven months and three extensions of time, the order was issued closing the mine. In essence, Bernitsky complains not of any negligent action but of regulatory enforcement action, *i. e.,* that the mine was closed, which Bernitsky argues was not reasonable under the circumstances. It is precisely that kind of judgment which the discretionary function exception encompasses.

In *Griffin v. United States,* 500 F.2d 1059 (3d Cir. 1974), this court had occasion to consider the purpose of the · discretionary function exception. There we emphasized it was aimed at protecting decisions involving "policy judgments as to the public interest." *Id.* at 1064. We stated that "[t]o determine the applicability of the discretionary function exception . . . we must analyze not merely whether judgment was exercised but also whether the nature of the judgment called for policy considerations." *Id.* In an earlier case, the panel had succinctly expressed the distinction by noting that "ordering an army maneuver is a discretionary function, but the negligent operation of an army vehicle during such a maneuver is not." *Ward v. United States,* 471 F.2d 667, 670 (3d Cir. 1973).

Therefore, our inquiry must be directed to the nature of the judgment which must be made in the decision whether to issue a Withdrawal Order closing a noncomplying coal mine. The Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801, *et seq.* (1976), was enacted as part of the continuing federal regulation of mine health and safety in coal. The Secretary of the Interior is required to designate mandatory health and safety standards following consultation and public hearing. 30 U.S.C. § 811. Among the standards which have been promulgated is that requiring each operator of a coal mine to maintain an approved sanitary toilet. The relevant regulation provides:

(a) Except as provided in § 75.1712–7, each operator of an underground coal mine shall, on and after December 30, 1970, provide and maintain one approved sanitary toilet, together with an adequate supply of toilet tissue, in a dry location under protected roof, within 500 feet of each working place in the mine where miners are regularly employed during the mining cycle. A single approved sanitary toilet may serve two or more working places in the same mine, if it is located within 500 feet of each such working place.

(b) Only sanitary toilets approved by the Health Division, Coal Mine Health and Safety, Bureau of Mines shall meet the requirements of this section.

(c) Applications for approval of sanitary toilets shall be submitted to:

Health Division, Coal Mine Health and Safety, Bureau of Mines, U.S. Department of the Interior, Washington, D.C. 20240.

30 C.F.R. § 75.1712–6 (1973).

The statute authorizes the Secretary to investigate and inspect mines subject to his jurisdiction for the purpose of determining

---

**3.** The only factual issues which Bernitsky raises in its unverified Answer to the Motion to Dismiss or Motion for Summary Judgment are the failure of the MESA inspector to inform it of the *proper method of obtaining approval of the toilet facility,* the failure to inform it as to which facilities were approved, and the fact that the February 13, 1974 Withdrawal Order was later abated. Even were these facts properly presented in opposing affidavits, they fail to alter the nature of the administrative decision which allegedly caused the damage, *i. e.* the Withdrawal Order.

whether the mine operator is complying with the mandatory health and safety standards which have been promulgated. 30 U.S.C. § 813(a)(4) (1976). These investigations are conducted by MESA inspectors. The MESA inspector who conducts the investigations and determines that a mine operator has failed to comply with the standards can issue either a withdrawal and debarment order closing the mine, or, if deemed appropriate, a notice of violation for lesser violations.

If an inspector determines, on inspection of a coal mine, that an "imminent danger exists", an order shall be issued withdrawing all but certain specified persons from the area until the inspector "determines that such imminent danger no longer exists." *Id.* § 814(a). On the other hand, when the inspector determines that the violation has not created an "imminent danger", "he shall issue a notice to the operator or his agent fixing a reasonable time for the abatement of the violation," which can be extended by the inspector, until s/he makes a determination "that the period of time should not be further extended." *Id.* § 814(b).[4] The judgmental nature of the inspector's determination whether to extend further the period of time for abatement of the violation is evidenced by two decisions of the Interior Board of Mine Operations Appeals. In *Old Ben Coal Compa-*

*ny*, 6 IBMA 294, 306 (1976), the Board enunciated its test concerning the validity of a section 104(b) [30 U.S.C. § 814(b)] order when it held that the inspector's determination to issue a section 104(b) order must be based on "the *facts* confronting the inspector at the time he issued the subject withdrawal order regarding whether an *additional* abatement period should be allowed." (emphasis in original). The Board framed the issue as "whether the inspector abused his enforcement discretion by issuing a withdrawal order instead of further extending the time for abatement", *id.*, and held that he did. Subsequently, in *United States Steel Corporation*, 7 IBMA 109, 114 (1976), the Board affirmed the Administrative Law Judge's conclusion "as a matter of law, that the inspector's authority under section 104(b) of the Act in determining whether the time allowed for abatement should be extended or an order of withdrawal issued carries the implication *that it will be exercised reasonably, not arbitrarily or capriciously.*" (emphasis added).

The record in this case discloses that the Mining Enforcement and Safety Administration sent representatives to meetings of inspectors at various district offices to call the inspectors' attention to the factors they should consider in exercising their discretion whether to issue notices and grant extensions. A speech, prepared by the

---

4.  The statute provides:

(a) If, upon any inspection of a coal mine, an authorized representative of the Secretary finds that an imminent danger exists, such representative shall determine the area throughout which such danger exists, and thereupon shall issue forthwith an order requiring the operator of the mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such imminent danger no longer exists.

(b) Except as provided in subsection (i) of this section, if, upon any inspection of a coal mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard but the violation has not created an

imminent danger, he shall issue a notice to the operator or his agent fixing a reasonable time for the abatement of the violation. If, upon the expiration of the period of time as originally fixed or subsequently extended, an authorized representative of the Secretary finds that the violation has not been totally abated, and if he also finds that the period of time should not be further extended, he shall find the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that the violation has been abated.

30 U.S.C. § 814(a) and (b) (1976).

Chief of Safety of MESA, and delivered on his behalf by Frank Henderson, a Coal Mine Specialist, at a district meeting attended by Inspector Updegrave, the inspector who issued the Withdrawal Order in this case, stressed the need for determination of what is a "reasonable time" for the abatement period, and whether "due diligence has been exercised in an attempt to gain compliance" before extensions are granted. It is apparent from the foregoing that the decisions regarding issuance of a notice of violation, extensions of time, and orders of withdrawal must be made by the individual inspectors on the basis of their experience and judgment, and therefore fall within the scope of the discretionary function exception. They are "matters involving balancing of policy considerations in advancing the public interest." *Griffin v. United States*, 500 F.2d 1059, 1064 (3d Cir. 1974). Decision making as to investigation and enforcement, particularly when there are different types of enforcement action available, are discretionary judgments. *In re Air Crash Disaster Near Silver Plume, Colorado*, 445 F.Supp. 384, 401–04 (D.Kan.1977); *see First National Bank in Albuquerque v. United States*, 552 F.2d 370, 375–76 (10th Cir.), *cert. denied*, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977). Thus, in making the determination of the course to follow, the MESA inspector must use his or her judgment as to the manner in which the statutory authority can best be effectuated, an act which cannot subject the government to tort liability.

In *Weinstein v. United States*, 244 F.2d 68 (3d Cir.), *cert. denied*, 355 U.S. 868, 78 S.Ct. 116, 2 L.Ed.2d 74 (1957), plaintiff's suit against the government charged that the enforcement by revenue agents of regulations regarding prohibited hours of operation of an alcohol denaturing plant and binded warehouse led to an explosion and fire causing death and injury. This court held that a charge based on the locking of the building which was in accordance with regulations promulgating under statutory authority must be dismissed because it fell within the discretionary function exception of the Tort Claims Act. The recent decision in *Griffin v. United States, supra*, on which appellant relies is not applicable to the type of decision making involved here. In *Griffin*, the government had undertaken to test and thereafter approved for release live virus polio vaccine that failed to meet the scientific standards set forth in the regulations. 500 F.2d at 1063–69. There is no analogy between the negligent failure to comply with regulations at issue there and the regulatory enforcement activity at issue here.

Additionally, we believe that it is significant that the Coal Mine Health and Safety Act itself provides the mechanism whereby notices of violation and withdrawal orders may be reviewed and that Bernitsky never availed itself of the opportunity to challenge the various notices of violation or the withdrawal order through the administrative route available. Under section 105(a)(1) of the statute, 30 U.S.C. § 815(a)(1) (1976), as it existed before amendment in 1977,[5] Bernitsky had the right to apply to the Secretary of the Interior or his delegate for review of the notice of violation and the order entered against it within thirty days of receipt of the order. Under regulations in effect in 1974, the Secretary's authority pertaining to applica-

---

5. Administrative changes were effected by the Amendment to the statute contained in the Federal Mine Safety and Health Amendments Act of 1977, Pub.L. 95–164, Nov. 9, 1977, 91 Stat. 1290, 30 U.S.C. §§ 801 *et seq.* (Supp. I 1977). The Act modified the FCMHSA to make it the single mine safety and health act, created an independent agency, the Federal Mine Safety and Health Review Commission, 30 U.S.C. § 823 (Supp. I 1977), which took over the func-

tions of the Interior Board of Mine Operations Appeals, and transferred most of the other duties of the Secretary of the Interior to the Secretary of Labor. The mine operators continue to have the right to seek review of notices and orders within thirty days of receipt of notification, 30 U.S.C. § 815(a) (Supp. I 1977) and they have the right to a hearing before the Commission, 30 U.S.C. § 815(d) (Supp. I 1977).

tion for review of the notices of violation and withdrawal orders was delegated to the Board of Mine Operations Appeals. 43 C.F.R. § 4.500(a)(1) (1973). Thereafter, the Secretary or his delegate would have been required to conduct an investigation, including a public hearing if requested, and issue a written decision, incorporating therein an order vacating, affirming or terminating the order. 30 U.S.C. § 815(b) (1976). The order would then have been subject to review in the Court of Appeals. 30 U.S.C. § 816(a) (1976). The Withdrawal Order in this case could have been issued only after a prior Notice of Violation. Had Bernitsky availed itself of the opportunity of challenging the Notice of Violation, which it had ample time to do, it might have been able to avoid the sequence of events which followed.

The administrative review procedure is the safeguard provided by Congress against arbitrary action or abuse of discretion by administrators in carrying out their responsibilities under federal statutes. The appropriate action by Bernitsky would have been an appeal using the applicable administrative procedure. It is instructive to compare, in this regard, the procedure used in *Golden Holiday Tours v. CAB*, 174 U.S.App. D.C. 292, 531 F.2d 624 (D.C.Cir. 1976), where an inclusive tour operator petitioned for review of the rejection by the CAB of an amendment to its prospectus which would have made available additional seats on certain transatlantic flights. In its review, the court noted that there was no request for damages, stating "It seems clear that damages would be barred under the discretionary activities exception to the Federal Tort Claims Act." *Id.*, 174 U.S. App.D.C. at 294, n.6, at 626, n.6.

We need not decide whether in every case the fact that the decision which is the basis of the claim could have been reviewed administratively indicates the decision is the type that is encompassed within the discretionary function exception nor whether the availability of administrative review is in-

compatible with tort liability under the Federal Tort Claims Act. Nor do we hold that the exception precludes review in every situation involving regulatory agencies or decisions. We merely hold that the specific enforcement activities in this case fall within the ambit of 28 U.S.C. § 2680(a).

■ The procedural posture of this case merits some comment. The district court granted the Government's motion to dismiss treating the issue raised as one of law. In this case the affidavits and accompanying material submitted in connection with the Government's Alternative Motion for Summary Judgment shed light on the propriety of a dismissal because of the discretionary function exception. Our review of the record shows that we have the factual basis upon which to make the determination relating to the application of the discretionary function provision. Since Bernitsky had a reasonable opportunity to present opposing affidavits and other evidence, and failed to show that there was any disputed issue of fact as to a material issue, a grant of summary judgment would have been appropriate. See note 3 *supra*. Therefore, we see no reason to remand the case to the district court for disposition, and for the sake of judicial economy we will affirm the dismissal on the basis of the discretionary function exception. *See Sprague v. Fitzpatrick*, 546 F.2d 560, 563 n.4 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977).

Accordingly, we will affirm the judgment of the district court.